```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,            :
                                     :
             v.                      :    MEMORANDUM AND ORDER
                                     :    20-CR-51 (WFK)
CARISSA SCOTT,                       :
                                     :
                                     :
                        Defendant.   :
-----------------------------------------------------------X
```

**WILLIAM F. KUNTZ, II, United States District Judge:**

On November 2, 2021, Carissa Scott ("Defendant") pled guilty to the sole count of an Indictment charging her with Wire Fraud Conspiracy, in violation of 18 U.S.C §§ 1343 and 1349. The Court now sentences Defendant and provides a complete statement of reasons pursuant to 18 U.S.C. § 3553(c)(2) of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons discussed below, Defendant is hereby sentenced to 2 years of supervised release with special conditions, restitution, forfeiture in accordance with the Order of Forfeiture, and a $100.00 mandatory special assessment.

**BACKGROUND**

On January 8, 2020, agents with the Federal Bureau of Investigation ("FBI") arrested Carissa Scott ("Defendant") at John F. Kennedy International Airport in the Eastern District of New York pursuant to an arrest warrant issued by the Honorable Magistrate Judge Sanket Bulsara the day prior. Presentence Investigation Report ("PSR"), ECF No. 47 ¶ 40. On January 9, 2020, Judge Bulsara arraigned Defendant on the Complaint and ordered her released on a $75,000.00 bond with one surety. ECF No. 9.

On February 5, 2020, a grand jury returned a single-count Indictment charging Defendant and co-Defendant Nancy Jean ("co-Defendant") with Wire Fraud Conspiracy contrary to 18 U.S.C § 1343, in violation of 18 U.S.C § 1349. Indictment, ECF No. 15. On February 14, 2020, the Honorable Magistrate Judge Lois Bloom arraigned Defendant on the Indictment, at which time

1

Defendant pled not guilty. ECF No. 21. On November 2, 2021, Defendant changed her plea to guilty pursuant to a plea agreement before the Honorable Magistrate Judge Roanne Mann.

On October 12, 2022, this case was reassigned from the Honorable Judge Sterling Johnson to this Court, over which the Honorable Judge William, F. Kuntz, II presides. On October 31, 2022, this Court accepted Defendant's guilty plea. ECF No. 64.

This Court hereby sentences Defendant and sets forth its reasons for Defendant's sentence using the rubric of the 18 U.S.C. § 3553(a) factors pursuant to 18 U.S.C. § 3553(c)(2).

**DISCUSSION**

I.  **Background**

Prior to their arrests, Defendant and co-Defendant were employees of Canvas Media Group ("Canvas"), an Atlanta-based company responsible for booking musical acts for concerts and events. PSR ¶ 4. While working for Canvas, Defendant served in numerous roles, including as an event coordinator, booking agent, account executive, and media specialist. *Id.*

The instant offense arises from a scheme Defendant and co-Defendant executed while under Canvas' employ. Defendants had devised a plan to defraud investors in a Sandy Hook Benefit Concert ("Benefit Concert"), which was being orchestrated by the Sandy Hook Promise Foundation ("the Foundation"), a charitable organization founded by families of victims of the Sandy Hook Elementary School shooting. *Id.* ¶ 6. Specifically, individuals associated with the Foundation ("victims") had hired Canvas to help organize a concert to raise funds to provide programs and develop practices to better protect children from gun violence. *Id.* As part of their scheme, Defendant and co-Defendant falsely claimed to act as booking agents for a number of famous musicians and also suggested they could secure top-tier musical acts to perform at the

2

Benefit Concert. *Id.* In actuality, Defendants were neither affiliated with those musicians nor had they spoken with any representative for said musicians. *Id.* ¶ 5.

In furtherance of the conspiracy, on several different occasions, Defendant spoke with victims via telephone, text, and email to inform them she was making arrangements and preparing contracts for various celebrity musicians to perform at the Benefit Concert. *Id.* ¶¶ 6-9. Defendant included payment-related information in her messages, namely, she instructed her victims on how to pay for the performers and secure their performance through deposits payable by wire. *Id.* Indeed, on October 31, 2019, at the direction of Defendant, one victim arranged to have a fellow Concert investor send a wire transfer in the amount of $100,000.00 to a Wells Fargo account jointly held in Canvas Media and co-Defendant Jean's names ("Wells Fargo Account"). *Id.* ¶¶ 8-9.

Furthermore, on November 12, 2019, after one victim became suspicious of Defendant and co-Defendant, Defendant and her co-conspirator used their account with MagicJack, an Internet-based telephone service provider, to call the victim while pretending to be Justin Timberlake's manager—one of the alleged concert performers—to assure the victim Mr. Timberlake intended to perform at the concert but required additional payments. *Id.* ¶¶ 11-12.

An undercover FBI agent was introduced to Defendant as a potential investor in the Benefit Concert following Defendant's November 12, 2019 call. *Id*. ¶ 13. During a recorded conversation with Defendant, she reiterated Mr. Timberlake's, and other premier musical performers', alleged concerns with the terms of their respective contracts and payment plans. *Id*. The undercover agent also asked Defendant and co-Defendant whether the deposit money used to secure the artists' performances was segregated and used just for the artist, and whether any money sent towards the deposit should be sent to co-Defendant Jean's account. *Id.* Both defendants confirmed that it should be. *Id.*

3

A subsequent conversation between the undercover FBI agent and Defendant and co-Defendant occurred on December 3, 2019. *Id*. ¶ 14. During this conversation, purportedly in order to ensure certain performers' performances at the Benefit Concert, Defendant and co-Defendant requested deposits be paid in full. *Id*. Additionally, when asked on the call how they derive profit from their work, Defendants suggested they make money on the back end and charge a ten percent booking fee. *Id*.

A review of the Wells Fargo Account verified an incoming transfer of $100,000.00 from a victim's account was received on October 31, 2019. *Id*. ¶ 15. The records do not reflect any outgoing payments to any party known to be associated with Mr. Timberlake, or any of the other artists, or their respective agents and management companies, whom Defendant and co-Defendant claimed to represent. *Id*. Instead, the records reflect, in the 30 days following the deposit, a payment approximating $4,000.00 was made to Mercedes-Benz; more than $8,700.00 was withdrawn in cash; a payment approximating $6,000.00 was sent via Cash App, a mobile payment service, to an individual identified as "Carissa"; and a payment approximating $1,203.00 was made to a Saks Fifth Avenue store. *Id*.

## II. Legal Standard

18 U.S.C. § 3553 outlines the procedures for imposing a sentence in a criminal case. A sentencing court must also consider the Sentencing Guidelines in addition to the seven factors listed in 18 U.S.C. § 3553(a) when making a sentencing decision. The Court has done so in this case.

The Sentencing Guidelines are merely advisory in light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 264 (2005). Nevertheless, the Guidelines range is the

4

"starting point and the initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* at 49. In this regard, the Guidelines provide "the framework for sentencing" and "anchor… the district court's discretion." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016) (internal reference and quotation marks omitted).

If and when a district court imposes a sentence outside of the Sentencing Guidelines range, the court "shall state in open court the reasons for its imposition of the particular sentence, and …the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing or varying "in a statement of reasons form." *Id.* "The sentencing court's written statement of reasons shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-0332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.).

This Court has considered the applicable Guidelines range as well as the seven factors listed in Section 3553(a). It addresses each in turn consistent with *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).

III.  Analysis

A.  **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

5

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

### 1. Family and Personal Background

Defendant was born on January 20, 1978 in Jackson, Mississippi to the marital union of Luis Scott and Linda Harrington. PSR ¶ 40. However, Defendant is not close with either of her parents and both are unaware of her instant offense. *Id.* Defendant reported her father was absent for much of her life and that her mother allegedly subjected Defendant to consistent verbal and physical abuse throughout her childhood. *Id.* ¶¶ 41-42. Indeed, Defendant claimed it is because of this abuse that she moved in with her maternal grandmother at age 11. *Id.* ¶ 41.

Defendant reported she and her grandmother resided together in Mississippi until Defendant reached the age of 16, when she was placed in a psychiatric institution following a physical altercation with her mother. *Id.* ¶¶ 41-42.

Defendant has never married. *Id.* ¶ 43. However, approximately 12 years ago, Defendant became romantically involved with Marcus Robson, and approximately one year later, the two had one child together, a daughter named Camden Robson, who presently lives with Defendant in Mississippi, and with whom Defendant is very close. *Id.* ¶¶ 43-44. Defendant and Mr. Robson are reportedly no longer romantically involved. However, Defendant stated the two presently share a decent relationship, and she noted further Mr. Robson contributes monthly child support. *Id.* ¶ 43 (Defendant reported Mr. Robson pays Defendant $329.00 in monthly child support; Defendant also noted to Probation at the time of her interview that neither Mr. Robson nor Defendant's daughter were aware of the instant offense).

### 2. Educational and Employment History

Defendant graduated from Jefferson County High School in Fayette, Mississippi in 1996. *Id.* ¶ 52. She later attended one semester of college at Alcorn State University in 2000, but ultimately dropped out. *Id.*

Defendant briefly enlisted in the United States Army in 1998 but was discharged from basic training after two months. *Id.* ¶ 55. Aside from this, Defendant reported she has been working as a self-employed promoter since the early 2000s. *Id.* ¶ 54.

### 3. Prior Convictions

Defendant has no prior arrests or criminal convictions. *Id.* ¶¶ 33-38.

### 4. Physical and Mental Health

Defendant was diagnosed with Lupus in May 2012. *Id.* ¶ 46. She also advised she suffers from "flare-ups" and blackouts when she is under stress as a result of this condition. *Id.* Furthermore, Defendant reported she suffers from depression, and that she has been in mental health treatment "on and off since she was a teenager." *Id.* ¶ 48. When she was 16 years old, Defendant was placed in a psychiatric institute, Charter Institution in Jackson, Mississippi, following a physical altercation with her mother. *Id.* She was reportedly diagnosed with multiple personality disorder and depression, experienced suicidal thoughts and was prescribed an unknown medication. *Id.*

Defendant reported she twice attempted suicide: once while in college and again when she was in her mid-twenties, after allegedly discovering the body of her close friend. *Id.* ¶ 49. Moreover, during Defendant's bail interview, she reported she was diagnosed with bipolar disorder at the age of 7 and reiterated she has been "in and out" of treatment since her childhood. *Id.* ¶ 50.

       5.       Substance Abuse

Defendant reported no history of substance abuse. *Id.* ¶ 51.

       6.       Nature and Circumstances of the Offense

The Court's previous statements make clear the nature and circumstances surrounding the instant offense. *See supra* at Section I.

    **B.**       **The Need for the Sentence Imposed**

The second 18 U.S.C. § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). The Court will address each subsection in turn.

Altogether, Defendant and co-Defendant solicited hundreds of thousands of dollars in furtherance of their fraudulent conspiracy. They did so by falsely stating the funds would be paid to the musicians in exchange for the musicians' performance at concerts. In actuality, Defendant and co-Defendant failed to pay the musicians as promised and instead misappropriated those funds. *Id.* This offensive conduct is serious. The Court cannot, and it does not, overlook this. However, the Court also recognizes the particular characteristics of this offense, and of this Defendant, suggest the need for deterrence and to protect the public are minimal here—as it will discuss further in the analysis to follow. *See supra* section III(D).

    **C.**       **The Kinds of Sentences Available**

8

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to the sole count of an Indictment charging her with Wire Fraud Conspiracy, in violation of 18 U.S.C. §§ 1343 and 1349. Defendant faces various penalties for committing this offense, including terms of imprisonment and supervised release in addition to fines and a special assessment.

Defendant faces a maximum term of imprisonment of twenty years and no minimum term of imprisonment. 18 U.S.C § 1343. Defendant also faces a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2). Defendant is eligible for not less than one nor more than five years of probation, and one of the following must be imposed as a condition of probation unless extraordinary circumstances exist: fine, restitution, or community service. 18 U.S.C. §§ 3561(c)(1) and 3563(a)(2). In addition, Defendant faces a maximum fine of $250,000.00. 18 U.S.C. § 3571(b).

The Court is also required to impose a mandatory special assessment of $100.00 per count, 18 U.S.C. § 3013, and restitution pursuant to 18 U.S.C. § 3663A. Moreover, Defendant is subject to the terms of the Order of Forfeiture, which the Court entered on March 27, 2023. Order of Forfeiture, ECF No. 80. *But see* PSR ¶ 71, n. 4 (according to the Order of Forfeiture, Defendant is obligated to pay a Forfeiture Money Judgement of $100,000.00 plus $19,679.99 in interest. *See* Order of Forfeiture at 1. However, Probation advised in the PSR the Government would only be seeking $17,896.00 in forfeiture from this Defendant).

**D.     The Kinds of Sentence and the Sentencing Range Established For Defendant's Offenses**

9

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

The applicable Guideline for violations of 18 U.S.C. § 1349 is U.S.S.G. §2X1.1. Pursuant to U.S.S.G. §2X1.1(a), Defendant's base offense level is determined by referencing the Guideline for the substantive offense, plus any adjustments from that Guideline that can be established with reasonable certainty. U.S.S.G. §2B1.1 is the Guideline for wire fraud, the substantive offense here. Therefore, Defendant's base offense level is seven (7) pursuant to U.S.S.G. §§2X1.1(a) and 2B1.1(a)(1).

Ten (10) levels are added to this figure pursuant to U.S.S.G. §2B1.1(b)(1)(F) since Defendant is accountable for a total intended loss amount of $250,000.00, which is more than $150,000.00, but not more than $250,000.00. This results in an adjusted offense level of seventeen (17). PSR ¶ 28. However, two (2) levels are removed pursuant to U.S.S.G. §3E1.1(a) since Defendant has clearly demonstrated acceptance of responsibility for the offense. Moreover, this figure is reduced by an additional one (1) level pursuant to U.S.S.G. §3E1.1(b) since the Government was timely notified of Defendant's intention to enter a plea of guilty. Altogether, these adjustments result in a total adjusted offense level of fourteen (14). *Id.* ¶ 32.

Defendant has no prior criminal convictions, which results in a subtotal criminal history score of zero, and according to the sentencing table in U.S.S.G. Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I (1). *Id.* ¶ 35.

Based upon a total adjusted offense level of fourteen (14) and a criminal history category of I (1), the recommended Guideline range of imprisonment is between 15 and 21 months. *Id.* ¶ 60.

All parties agree with this calculation. *See* Def. Mem., ECF No. 87 at 2. Nevertheless, both defense counsel and Probation urge the Court to impose a downward variance from recommended range. Specifically, both seek non-custodial sentences: defense counsel requests the Court impose a sentence of time-served, while Probation recommends the Court impose a sentence of two (2) years' probation with special conditions. *See* Def. Mem. at 1; Probation's Recommendation, ECF No. 47-1 at 1.

Defense counsel cites a number of factors in support of his recommendation for a sentence of time-served. *See generally* Def. Mem. To begin, defense counsel recounts the tragic circumstances of Defendant's childhood and early adult years. *Id.* at 2-5. He discusses how Defendant suffered years of mental and physical abuse at the hands of her mother, and how Defendant's mother moved Defendant between homes and kept the identity of Defendant's father a secret from her, thus causing continuous disruption throughout her formative years. *Id.* at 3. Notably, he also describes the trauma Defendant experienced as a young adult when she discovered her roommate shot dead on the floor in the home they shared together, and again two years later, when Defendant witnessed her boyfriend being shot and held him in her arms as he died. *Id.*

Defense counsel also notes how these experiences—her mother's abuse and the violent passing of her loved ones—caused Defendant to develop Post Traumatic Stress Disorder ("PTSD"), which, according to Defendant's doctors, contributed to Defendant twice attempting suicide. *See* Exhibit 1, ECF No. 87 (Dr. Sanford L. Drob, Ph.D.'s forensic psychological evaluation report discussing this diagnosis and Defendant's medical condition more generally). Defense counsel notes further, since her suicide attempts, Defendant has been diagnosed with depression and anxiety and has suffered from dramatic mood swings and auditory hallucinations, which her treating psychologist suggests are indicative of psychosis and schizophrenia. Def. Mem.

11

at 3 (referencing Exhibit 1 ((Dr. Sanford L. Drob, Ph.D.'s forensic psychological evaluation report)).

It is with Defendant's tragic upbringing and fragile mental state in mind that defense counsel recounts how Defendant came to be involved with her co-Defendant and ultimately with the offense at hand. Defense counsel describes how Defendant was "enamored" with her co-Defendant, how her co-Defendant convinced Defendant—then a small-time music producer—to join forces with her by painting herself as a far more successful music producer, and, ultimately, how her co-Defendant convinced Defendant to join her scheme to defraud concert investors, which Defendant allegedly did not know was a ruse until it was well in motion. *Id.* at 4-5 ("At first, [Defendant] believed that [co-Defendant] was completely legitimate and that she was genuinely in touch with the stars she claimed to be working with. . .[Defendant] who was starved for affection and human contact, gradually came to trust [co-Defendant] and to reciprocate her purported affection. By the time she began to realize that [co-Defendant] was lying about her contacts with the big-time stars and their representatives, [Defendant] found herself paralyzed with fear and unable to extricate herself from [co-Defendant's] scheme. Instead, she deluded herself into believing that they were doing nothing wrong, and that things would sort themselves out by the time of the concert. To her lasting regret, she continued to deceive the investors and to assist in her 'big sister' [co-Defendant's] ill-conceived scheme.").

In sum, defense counsel argues in favor of a non-custodial sentence of time served because Defendant "did not agree initially to work with [co-Defendant] with the intent to commit a crime. She foolishly and naively trusted [co-Defendant], who took advantage of her cognitive and emotional limitations and manipulated [Defendant] into furthering her fraudulent scheme." *Id.* at 5. Adding, "[a]lthough [Defendant] should have known better and should have abandoned the

12

scheme when she began to suspect that [co-Defendant] was lying to her and to the investors, she simply lacked the cognitive and emotional faculties needed to do so." *Id.*; *see also* Exhibit 1 at 10 ("Ms. Scott is highly dependent on others, views herself as inept and inadequate and is interpersonally submissive…[S]he feels compelled, as a result of her own perceived inadequacies, to turn to others for guidance and, as such, surrenders her autonomy and is readily manipulated…In spite of a strong tendency to avoid relationships, in part out of an intense fear of rejection, she is highly susceptible to the influence of others…She does not appear to have the capacity to come up with and sustain the Scheme she has pled guilty to on her own.").

Defense counsel also argues a below-Guidelines sentence of time served would be sufficient, but not greater than necessary, to achieve the objectives of section 3553(a). Def. Mem. at 5. On this point, defense counsel first notes "no additional term of incarceration is necessary to reflect the seriousness of the offense, promote respect for the law and provide just punishment" as Defendant, although "undeniably responsible for her actions" and admitting of her guilt "is nevertheless substantially less culpable than [co-Defendant] who conceived of the fraudulent scheme, recruited her to take part, preyed on her naiveté and need for affection and used most of the money obtained for her own personal benefit." *Id.* at 6. Defense counsel also argues a "sentence of time served would also be sufficient but not greater than necessary to fulfill the goals of specific and general deterrence. . ." as Defendant "has had no prior contact with the criminal justice system, is extremely remorseful and has found this case exceedingly difficult and painful." *Id.* Next, defense counsel argues a "sentence of time served is also necessary to ensure that [Defendant] continues to receive needed treatment." *Id.* Lastly, defense counsel suggests the Court should be mindful of the collateral consequences a term of incarceration will have, namely, the effect it would have on Defendant's daughter—whom Defendant claims in her letter before the

13

Court is "the only reason [she] wants to live[,]" Exhibit 2, ECF No. 47-2, and who has herself written to the Court on her mother's behalf, stating "she is the only person that is always there for[] me and loves me. I cannot see myself without her." *See* Exhibit 3, ECF No. 47-3.

The Court acknowledges the troubling hardships Defendant has experienced in her life, and it commends Defendant for correcting the wrongs done to her as evinced in the doting manner in which she has raised her daughter. The Court also appreciates the time Defendant and her daughter have taken to write to the Court in anticipation of Defendant's sentencing. The Court has carefully considered their words.

Furthermore, the Court has also carefully considered Probation's recommendation, in which they agree with defense counsel that a custodial sentence is perhaps not warranted for this Defendant. *Id.* ¶ 74; *see also* Probation's Recommendation at 1. Instead, Probation recommends two (2) years' probation with special conditions and an Order of Restitution in the amount of $100,000.00. Probation's Recommendation at 1. In so saying, Probation notes Defendant's "significant mental health issues, including [her] history of depression and suicidal ideations[,]" in addition to her Lupus diagnosis—and the effect it has had on her memory and physical health— are mitigating factors. PSR ¶ 74. Indeed, Probation believes such factors warrant a sentence below the advisory guideline range and a non-incarceratory sentence." Probation's Recommendation at 3. Probation also notes the nature and circumstances of the offense, Defendant's history of suffering both physical and mental abuse, Defendant's physical and mental ailments—namely, her Lupus and bipolar diagnoses—and her lack of criminal history justify a non-custodial sentence. *Id.*

The Government seems to agree. While the Government does not recommend a particular sentence, it echoes much of the reasoning set forth by defense counsel and Probation, which

14

militates in favor of leniency. Gov't Mem., ECF No 90. The Government notes, while the instance offense was a "brazen," the Government agrees with Defendant: the available evidence suggests she was not the leader of this fraud scheme despite being the person in closest communication with the victim, and despite being aware—even if not until later—Defendant and co-Defendant were engaged in a scheme to defraud innocent victims. *Id.* at 3. Still, the Government notes Defendant's personal characteristics are mitigating factors and should be taken into account. Specifically, the Government cites Defendant's medical history, as described in the PSR and in Exhibit 1 of defense counsel's sentencing submission, which is a report prepared by forensic psychologist, Dr. Drob. *Id.* The Government agrees with defense counsel that Defendant exhibits a "diminished intellectual capacity and struggles with significant mental health challenges and past trauma." *Id.* While the Government does not claim this factor justifies Defendant's involvement in the offense, it does argue continued mental health treatment may be an effective means of preventing this defendant from engaging in further criminal conduct. *Id.* Importantly, and as noted by Probation and defense counsel, the Government is concerned about the effect Defendant's incarceration would have on Defendant's daughter. *Id.* at 4. Indeed, this point is partially relevant to the fifth section 3553(a) factor regarding policy-related concerns, which the Court addresses next.

### E.   Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

While not a policy statement *per se*, the Government notes the unavailability of a caregiver for a minor child is a basis for compassionate release under the sentencing guidelines. Gov't Mem. at 4 (referencing U.S.S.G. 1B1.13, Application Note 1(C) (providing that the death or incapacitation of a minor child's caregiver where the defendant would be the only available

15

caregiver is an extraordinary circumstance for purposes compassionate release)). Defendant is not incarcerated. Therefore, this sentencing provision is not directly applicable to her. That said, the underlying rationale applies nevertheless: courts should consider the impact a sentence has on children who rely on their parents who are subject to terms of incarceration.

### F.     The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires this Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

The Court has premised its sentence around the nature and characteristics of *this* Defendant and of the instant crime of conviction. The Court has carefully considered the sentencing options written into the statute and recommended by the Guidelines. In doing so, the Court has ensured the sentence it now imposes will avoid unwarranted sentence disparities.

### G.     The Need to Provide Restitution

Lastly, the seventh 18 U.S.C. § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to 18 U.S.C. § 3663A, restitution in the total amount of $100,000.00 shall be ordered in this case. *See also* PSR ¶¶ 69-70 (U.S.S.G. § 5E1.1 also provides restitution is mandatory in this case).

## IV.     CONCLUSION

For the reasons set forth above, the Court determines a sentence of 2 years of supervised release with special conditions, forfeiture in accordance with the Order of Forfeiture, restitution,

and a $100.00 mandatory special assessment is consistent with, and is sufficient but no greater than necessary to accomplish, the purposes of § 3553(a)(2). The Court does not impose a fine because Defendant appears unable to pay a fine.

The Court expressly adopts the factual findings of the Presentence Investigation Report and the addenda thereto, barring any errors contained therein, to the extent they are not inconsistent with this opinion.

SO ORDERED.
s/ WFK
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: July 25, 2023
      Brooklyn, New York